UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.                              Case No:  2:21-cv-538-JES-NPM

JOSEPH B. WILLIAMS III and
MEREDITH LEE SMITH-WIL-
LIAMS, as nominee for Jo-
seph B. Williams III,

        Defendants.

_____

### OPINION AND ORDER

        The United States of America (Plaintiff or the United States)
filed a four-count Complaint against Joseph B. Williams III (Wil-
liams) and Meredith Lee Smith-Williams (Smith-Williams), as nomi-
nee for Joseph B. Williams III (collectively Defendants). (Doc.
#1.) This matter comes before the Court on Plaintiff's Motion for
Summary Judgment. (Doc. #50.) Defendants filed a Response in Op-
position (Doc. #54), to which Plaintiff filed a Reply (Doc. #55.)
For the reasons set forth, the motion is granted.

**I.**

        Summary judgment is proper where the evidence "shows that
there is no genuine dispute as to any material fact and the movant
is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).
"A genuine issue of material fact exists 'if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party.'" <u>Edmondson v. Velvet Lifestyles, LLC</u>, 43 F.4th 1153, 1159 (11th Cir. 2022)(quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). "If there is not sufficient evidence for a jury to find for the non-moving party, or '[i]f the evidence is merely colorable,' or if it 'is not significantly probative,' then summary judgment is appropriate." <u>Id</u>. (quoting <u>Anderson</u>, 477 U.S. at 249-50).

The movant bears the initial burden of demonstrating an absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). "Once the movant adequately supports its motion, the burden shifts to the nonmoving party to show that specific facts exist that raise a genuine issue for trial." <u>James River Ins. Co. v. Ultratec Special Effects Inc</u>, 22 F.4th 1246, 1251 (11th Cir. 2022) (quoting <u>Dietz v. Smithkline Beecham Corp.</u>, 598 F.3d 812, 815 (11th Cir. 2010)). In ruling on a motion for summary judgment, the Court views all evidence and draws all reasonable inferences in favor of the non-moving party. <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007); <u>Baxter v. Roberts</u>, 54 F.4th 1241, 1253 (11th Cir. 2022).

## II.

In 2003, Williams pled guilty in New York federal court to a two-count superseding criminal information charging tax evasion and conspiracy to defraud the United States. The offenses related

to depositing monies into Swiss bank accounts from 1993 through 2000.[1] In September 2003, United States District Judge Harold Baer sentenced Williams to 46 months imprisonment, followed by three years of supervised release, and set restitution at $3.512 million — the stipulated amount of readily provable tax loss. Judge Baer ordered Williams to transfer the total balance held in the Swiss Bank accounts to the Clerk of the Court for the Southern District of New York. The Clerk of Court received the money and from it issued the restitution payment to the IRS on January 7, 2004. The parties agreed that the remaining balance from the Swiss accounts — $4,431,051.33 — would stay with the Clerk of Court until final determination of Williams' liability, including penalties and interest.

When Williams was released from incarceration on May 21, 2006, the IRS was still examining his tax returns for tax years 1993 to 2000. On October 29, 2007, the IRS determined the deficiencies and penalties for these years and issued Williams a notice of deficiency. Williams disagreed with the assessment and filed suit in Tax Court to redetermine the deficiencies and penalties.

---

[1] Although not material to this case, the factual background for Williams and his tax-related conduct can be found at Williams v. Comm'r, 2009 WL 1033354 (T.C. Apr. 16, 2009); Williams v. Comm'r, 2011 WL 1518581 (T.C. Apr. 21, 2011).

In April 2011, the Tax Court sided with the IRS, finding (among other things) that Williams was liable for tax in each year, the civil fraud penalty for the entire underpayment, and the accuracy-related penalty. Williams, 2011 WL 1518581. In December 2012, the Fourth Circuit Court of Appeals affirmed. Williams v. Comm'r, 498 F. Appx. 284 (4th Cir. 2012).

The Clerk of the Court transferred the leftover balance from the Swiss bank accounts to the IRS in 2013, but unpaid tax liabilities remained on Williams' tax accounts. The IRS began efforts to collect the unpaid amount. From March 2013 to January 2016, Williams received at least four notice letters of unpaid tax liabilities from the IRS. The last of these, dated January 4, 2016, stated that Williams owed $5,611,075.19 and that a failure to pay by January 19, 2016 could subject him to "enforced collection," such as "placing a levy on your bank accounts, wages, receivables, commissions, etc. It could also involve seizing and selling your property, such as real estate, vehicles, or business assets." (Doc. 50, Ex. 5.)

Roughly four months later, a series of relevant transactions occurred:

- May 10, 2016: Williams wrote a check to Smith-Williams for $152,745 from his personal bank account;

- May 11, 2016: A check made payable to Williams for $47,255 was deposited in Smith-Williams' personal account;

4

- May 19, 2016: Williams wrote a check to Smith-Williams for $7,000 from his personal bank account;

- May 19, 2016: Smith-Williams wrote a check to herself for $22,000 from a joint bank account she shared with Williams;

- May 19, 2016: A tax refund check from the State of Virginia for $6,983.00 made payable to Williams and Smith-Williams was deposited in Smith-Williams' personal account;

- May 25, 2016: Williams wired $51,955.70 from his personal account to Superior Title Services of Sanibel.

All told, a total of $287,938.70 was transferred. Smith-Williams purchased a house on Sanibel Island (the Sanibel Property) a few days later. The Sanibel Property was purchased without a mortgage and titled exclusively to Smith-Williams.

On June 25, 2019, a Notice of Federal Tax Lien was recorded in Lee County, Florida against Williams. It was refiled on June 22, 2021. On September 13, 2019, a Notice of Federal Tax Lien was recorded in Lee County, Florida against Smith-Williams, as Williams' nominee.

The United States asserts that, as of March 2, 2023, Williams still owes $6,897,077.16 in tax liabilities.

**III.**

Based on "[t]he undisputed material facts," the United States seeks (1) a monetary judgment against Williams for unpaid federal tax liabilities and (2) a declaratory judgment that federal tax

5

liens attach to all of Williams' property, including his alleged interest in the Sanibel Property. (Doc. #50, pp. 1, 25.) The Court addresses each matter in turn.

### A. Williams' Tax Liability

Count I of the Complaint alleges that Williams owes unpaid tax liabilities for years 1996 through 1999. (Doc. #1, ¶¶ 21-23.) The United States asserts that a monetary judgment is warranted because (1) the Tax Court and the Fourth Circuit Court of Appeals have already rendered a final decision on Williams' tax liabilities for the years in question, and Williams is barred from relitigating the issue under *res judicata*, and alternatively, (2) Williams has not provided evidence to overcome the assessment's presumption of correctness. (Doc. #50, p. 14.)   Williams, on the other hand, argues against these positions and asserts that he has long ago paid all of the taxes owed when he paid the restitution imposed in his criminal case.

### (1)  Res Judicata

"To invoke res judicata—also called claim preclusion—a party must establish four elements: that the prior decision (1) was rendered by a court of competent jurisdiction; (2) was final; (3) involved the same parties or their privies; and (4) involved the same causes of action." TVPX ARS, Inc. v. Genworth Life & Annuity Ins. Co., 959 F.3d 1318, 1325 (11th Cir. 2020)(citing Trustmark Ins. Co. v. ESLU, Inc., 299 F.3d 1265, 1269 (11th Cir. 2002)). At

its core, "res judicata bars only those claims that could have been raised in the prior litigation." Griswold v. Cnty. Of Hillsborough, 598 F.3d 1289, 1293 (11th Cir. 2010).

It is clear from the record that the first three requirements are met. The Tax Court is a court of competent jurisdiction. Williams challenged the tax deficiency notice in Tax Court, and the Tax Court had jurisdiction pursuant to 26 U.S.C. § 6213(a)(granting the Tax Court jurisdiction to redetermine a deficiency assessed by the IRS). The Fourth Circuit Court of Appeals was also a court of competent jurisdiction and its judgment was final. 26 U.S.C. § 7482(a)(1) ("The United States Courts of Appeals . . . shall have exclusive jurisdiction to review the decisions of the Tax Court . . . and the judgment of any such court shall be final . . . .") The Tax Court and Fourth Circuit cases were litigated by the same parties or their privities. Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 402-03 (1940) ("There is privity between officers of the same government so that a judgment in a suit between a party and a representative of the United States is res judicata in relitigation of the same issue between that party and another officer of the government.").

The fourth requirement—that the cases involve the same causes of action—turns on whether the "case 'arises out of the same nucleus of operative facts, or is based upon the same factual predicate, as a former action.'" TVPX ARS, Inc., 959 F.3d at

1325 (quoting Griswold, 598 F.3d at 1293). Two cases arise out of the same nucleus of operative facts if "the primary right and duty are the same." Id. (quoting Adams v. S. Farm Bureau Life Ins. Co., 493 F.3d 1276, 1289 (11th Cir. 2007)). The Eleventh Circuit has repeatedly recognized that "[r]es judicata applies not only to the exact legal theories advanced in the prior case, but to all legal theories and claims arising out of the same nucleus of opera-tive facts." De Souza v. JP Morgan Chase Home Lending Div., 608 F. App'x 776, 780 (11th Cir. 2015) (quoting Wesch v. Folsom, 6 F.3d 1465, 1471 (11th Cir. 1993)).

The sums disputed by Williams in Tax Court and the Fourth Circuit were as follows:

| Tax Year | Deficiency | Fraud Penalties | Accuracy-related Penalties |
|---|---|---|---|
| 1993 | $417,652.00 | $313,038.00 | _____ |
| 1994 | $304,740.00 | $226,206.75 | _____ |
| 1995 | $417,354.00 | $313,015.50 | _____ |
| 1996 | $1,572,673.00 | $1,179,504.75 | _____ |
| 1997 | $809,620.00 | $511,143.00 | $25,619.20 |
| 1998 | $52,733.00 | $39,549.75 | _____ |
| 1999 | $113,049.00 | $33,395.25 | $13,704.40 |
| 2000 | $120,391.00 | $74,093.25 | $4,320.00 |

(Doc. #50, Ex. 21 at p. 2); Williams v. Comm'r, WL 1518581, at *1 (T.C. April 21, 2011), aff'd, 498 F. App'x 284 (4th Cir. 2012). The sums pursued by the United States now are:

| Tax Year | Late Payment Penalty | Assessed Interest | Accrued Interest | Credits | Total Balance |
|---|---|---|---|---|---|
| 1996 | _____ | $4,571,971.34 | $473,502.60 | $1,333,998.27 | $3,711,475.67 |
| 1997 | $105,250.60 | $2,488,469.87 | $373,269.09 | $1,760.25 | $2,965,229.31 |
| 1998 | _____ | $105,963.03 | $15,259.77 | _____ | $121,222.80 |
| 1999 | _____ | $93,735.25 | $12,481.13 | $7,067.00 | $99,149.38 |
| | | | | | Total: $6,897,077.16 |

(Doc. #50, Ex. 8, pp. 1, 12, 19, 25.) It is immediately apparent that the sums are not the same. In the Tax Court, Williams disputed deficiency amounts and fraud and accuracy-related penalties. In contrast, the sums at issue in the current case only relate to interest and a separate late payment penalty. This makes sense since the notice of deficiency Williams received did not include interest charges. See (Doc. #54, Ex. 6.)[2] Therefore, the monies

---

[2] In their response in opposition to Plaintiff's motion for summary judgment (Doc. #54), Defendants labeled their exhibits, including this one, in letter format (A,B,C, etc.). Instead of the alphabetical letters used by Defendants, the Court will cite each exhibit by the numerical number assigned to it by the Court's CM/ECF system.

pursued by the United States in this current case were not liti-gated in the first case.

The doctrine of res judicata, however, bars both "claims that were *or could* have been litigated in a prior action between the same parties." Lobo v. Celebrity Cruises, Inc., 704 F.3d 882, 892 (11th Cir.2013)(emphasis added). "For *res judicata* pur-poses, 'claims that "could have been brought" are claims in ex-istence at the time the original complaint is filed or claims *ac-tually* asserted by supplemental pleadings or otherwise in the ear-lier action." De Souza, 608 F. App'x at 780 (quoting Manning v. City of Auburn, 953 F.2d 1355, 1360(11th Cir. 1992)).

The late payment penalty and the assessed interest could not have been brought by Williams in Tax Court because both were levied after the Tax Court decision. The Tax Court issued its decision on April 21, 2011. (Doc. #50, Ex. 21, p. 1.) The late payment penalty was assessed in 2014. (Doc. #50, Ex. 8, p. 15.) The first assessed interest was levied on September 7, 2011 and was followed by more assessments each year from 2013 until 2019. (Doc. #50, Ex. 4.) Res judicata therefore does not bar Williams from disputing the late payment penalty or the assessed interest.

 Additionally, Williams could not have brought a claim for the accruing interest because the Tax Court would not have had jurisdiction over any claim by Williams for interest. "The Tax Court's jurisdiction is limited to the deficiency in the notice,

which does not include interest pursuant to §§ 6601(e)(1) and 6211(a)." <u>United States v. Beane</u>, 841 F.3d 1273, 1284 (11th Cir. 2016).[3] Indeed, when Williams sought relief in the Tax Court over interest, the Tax Court struck Williams' petition based on a lack of jurisdiction. Opinion, <u>Williams v. Comm'r</u>, No. 2202-08 (T.C. Oct. 2, 2008). The <u>Beane</u> court found res judicata could not apply to a decision from a Tax Court regarding interest. <u>Id</u>., 841 F.3d at 1284.

Res judicata also fails to attach to the interest because it is a different cause of action. "[R]es judicata does not apply to suits involving different types of tax liability, even when the suits involve the same underlying transaction, and, at least in some respects, the same tax year." <u>Id</u>. at 1285 (quoting <u>Batchelor-Robjohns v. United States</u>, 788 F.3d 1280, 1289 (11th Cir. 2015)). As discussed, a tax deficiency is a different tax liability than interest. The United States is now pursuing the interest, while the Tax Court solely addressed Williams' tax deficiencies and other penalties. As the <u>Beane</u> court found, res judicata does not apply

---

[3] The <u>Beane</u> court recognized that "in some instances, such as overpayment, the Tax Court may have jurisdiction over interest issues . . . ." <u>Id</u>. at 1284. However, none of the exceptions apply here. <u>See</u> <u>Hill v. Comm'r</u>, 2023 WL 2847906, at *6-7 (11th Cir. Apr. 10, 2023)(holding that a Tax Court only has jurisdiction to rede-termine interest after judgment in two instances: (1) when the taxpayer has paid the entire amount of the deficiency plus interest or (2) when the taxpayer has made an overpayment).

to the interest claim. Id. The Court concludes that res judicata does not bar Williams from disputing the current sums now pursued by the United States.

### (2)  Restitution As Full Payment of Taxes

Williams argues that he owes no interest because he long ago paid the full amount of the taxes owed by paying the amount imposed by the sentencing court as restitution. While Williams did pay the restitution amount, this was not necessarily the full payment of taxes. Williams recognized this at his sentencing. See United States v. Williams, 2003 WL 22434145, at *1 n.6 (S.D.N.Y. Oct. 23, 2003)(quoting Williams as "understanding" the tax loss to be $3.512 million but that "separate and apart" from that payment, Williams would still owe "penalties and interest"). Now, the Government is pursuing the outstanding penalties and interest. This is proper according to the Second Circuit Court of Appeals, the court with appellate jurisdiction over the Southern District of New York. See United States v. Helmsley, 941 F. 2d 71, 102 (2d Cir. 1991)(explaining that a criminal court can order restitution for the readily ascertainable "unpaid taxes" and then the "government may pursue a tax evader for [any other] unpaid taxes, penalties and interest in a [subsequent] civil proceeding."). Williams' argument fails.

### (3)   Presumption of Correctness

The United States alternatively argues that a federal tax assessment enjoys a legal presumption of correctness, and Williams has not provided evidence to overcome that presumption and prevent a monetary judgment in the United States' favor. (Doc. #50, pp. 13-14.)

"In reducing an assessment to judgment, the Government must first prove that the assessment was properly made." United States v. White, 466 F.3d 1241, 1248 (11th Cir. 2006). "An assessment 'amounts to an IRS determination that a taxpayer owes the [f]ederal [g]overnment a certain amount of unpaid taxes,' and is 'entitled to a legal presumption of correctness—a presumption that can help the [g]overnment prove its case against a taxpayer in court." United States v. Stein, 881 F.3d 853, 854-55 (11th Cir. 2018)(alteration in original)(quoting United States v. Fior D'Italia, Inc., 536 U.S. 238, 242 (2002)). "Submission of a Form 4340 creates a presumption that the assessment was proper." United States v. Korman, 388 F. App'x 914, 915 (11th Cir. 2010)(citing White, 466 F.3d at 1248).

The United States has provided four 4340 forms here, one for each tax year in question. See (Doc. #50, Ex. 4.) "[A]s a result[,]the burden is on the taxpayer to prove by preponderance of the evidence that they are incorrect." McKenny v. United States, 973 F.3d 1291, 1296 (11th Cir. 2020). "If no countervailing proof

is introduced, 'the trial court [is] . . . justified, in fact required, to enter summary judgment for the amount of the taxes proved to be due." United States v. Chambers, 2014 WL 2136041, at *9 (M.D. Fla. May 22, 2014)(quoting United States v. Dixon, 672 F.Supp. 503, 507 (M.D. Ala. 1987)).

Williams offers a variety of arguments in an attempt to rebut the presumptive correctness of the assessments. All fail.

### (a)  Miscalculations of Interest

Williams suggests that the IRS miscalculated the interest charges. Williams points to a letter from 2013 where the IRS identifies his tax liability to be $12,885,271.87, and compares it to the current $6,897,077.16 being pursued by the Plaintiff. (Doc. #54, p. 12.)  Williams characterizes the differing tax liability totals as "conflicting" and irreconcilable. (Id.) While the numbers are different, the difference are attributed to subsequent payments and credits. See (Doc. #50, Ex. 4.)

Williams also mentions that he was not presented with "any methodology for calculating interest" or "any interest calculations." (Doc. #54, p. 12.) But the methodology employed by the IRS for charging interest is laid out in great detail in federal statutes, including when interest begins and ceases to accumulate (26 U.S.C. § 6601), how the applicable interest rate itself is calculated (26 U.S.C. § 6621), and fixing the interest to compound daily (26 U.S.C. § 6622). Additionally, the interest computation tables

for each of the tax years in question were a part of Plaintiff's summary judgment papers. See (Doc. # 50, Ex. 8.)

"The '[g]eneral rule' for interest on an underpayment is: 'If any amount of tax . . . is not paid on or before the last date prescribed for payment, interest on such amount . . . shall be paid for the period from such last date to the date paid.'" Beane, 841 F.3d at 1282 (quoting 26 U.S.C. § 6601(a)). The interest computation tables show that the accruing interest began compounding daily on April 15 of the following year for each tax year and has not since ceased, e.g., for the 1996 tax year, interest began accruing on April 15, 1997 and has continued. See (Doc. #50, Ex. 8, at pp. 2, 13, 20, 26); (Doc. #50, Ex. 1, ¶ 33.) The assessment for the accrued interest is proper on its face. "The taxpayer has the burden of proving that the computational method used is arbitrary and without foundation." Olster v. Comm'r, 751 F.2d 1168, 1174 (11th Cir. 1985). Williams superficial characterization as conflicting and irreconcilable does not suffice to show the computational method was arbitrary and without foundation.

**(b)  Use-of-Money Principle**

Williams argues that the use-of-money principle, as applied in Goldring v. United States, 15 F.4th 639 (5th Cir. 2021), nullifies the interest charges. (Doc. #54, pp. 2-3, 13-15.) "Under the use-of-money principle, a taxpayer is liable for interest only when the Government does not have the use of money it is lawfully

15

due." Goldring, 15 F.4th at 647 (citing Manning v. Seeley Tube & Box Co., 338 U.S. 561, 566 (1950)). In essence, Williams argues that once the funds were taken from his Swiss bank accounts in 2003, the government enjoyed full use of the money and therefore the "interest is nullified [because] the Government [was] holding and using the taxpayer's funds." (Doc. #54, p. 14.)

Goldring is not binding precedent, and no Eleventh Circuit decision has applied the use-of-money principle to a § 6601 underpayment case. Goldring cites Manning as the Supreme Court case establishing the use-of-money principle. Goldring, 15 F.4th at 647. Yet the Eleventh Circuit discussed the Manning holding thoroughly in a § 6601 underpayment interest case and did not articulate the use-of-money principle. See Beane, 841 F. 3d at 1281.

The Goldring court did identify Vick v. Phinney, 414 F.2d 444, 448 (5th Cir. 1969) as having "endorsed the use-of-money principle in . . . § 6601(a) underpayment interest" cases. Goldring, 15 F.4th at 647. And Vick is binding precedent. See Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981)(en banc). But even assuming arguendo that the use-of-money principle is recognized in this Circuit, it would not shield Williams from the interest charges. In Goldring, the taxpayers overpaid their tax liabilities directly to the IRS in an amount sufficient to cover any later-determined tax deficiency. Id., 15 F.4th at 642.

16

It was "not in dispute that the IRS had continuous use of suffi-cient" funds to cover any deficiency. Id. at 648. In contrast, all the evidence here indicates the IRS was never in possession or had use of sufficient funds to cover the deficiencies.

Judge Baer in Williams' criminal case clarified how the Swiss bank account money was to be disposed of, in accordance with what "the parties [had] agreed" to:

> It was ordered that all of the approximately $8 million in the Alqi Holding accounts was to be forwarded to the Clerk of this Court. It was not my intention that all these funds were to be ordered part and parcel of the order of restitution. Rather, I understood and intended that while all the funds from the Alqi Holding accounts were to be forwarded to the Clerk of this Court by or before November 17, 2003, only $3.512 million of this amount was restitution, the balance to be held by the Clerk of this Court until Williams and the IRS reached an accord and that dollar amount was then to be forwarded to the IRS.

Williams, 2003 WL 22434145, at *2. On January 7, 2004, the IRS received a check for $3,512,000.00 from payer "United States Treas-ury- U.S. District Court New York, NY." (Doc. #50, Ex. 2.) The IRS computation tables show Williams' tax balances were credited on January 7, 2004. (Id., Ex. 8, pp. 3, 20, 26.) On April 2013, a few months after the Fourth Circuit affirmed the Tax Court's decision, Judge Baer ordered "that the Clerk of the Court shall release the entire $4,431,051.33 to the IRS to defray in part the tax lien imposed by the IRS against Defendant." (Id., Ex. 23.) Days later, a check for $4,431,051.33 was issued to the IRS from the "United

States Treasury- U.S. District Court New York, NY." (Id., Ex. 3.)
The computation tables again show Williams' tax balances were
credited accordingly. (Id., Ex. 8, pp. 4, 15, 22, 28.)

Williams asks this Court to accept the stipulation of facts
between the parties in the Tax Court case as "correct." (Doc. #54,
p. 10.) The stipulation of facts only confirm the IRS had no
possession or use of the excess money:

> On January 7, 2004, pursuant to the order of restitution
> entered against [Williams], the Clerk credited only
> $3,512,000.00 of the funds under his control to the In-
> ternal Revenue Service [That amount has been held by the
> Internal Revenue Service as an advance payment on the
> deficiencies herein.] The Balance of the funds from the
> ALQI accounts has been held by the Clerk.

(Id., Ex. 7.) Williams seems to acknowledge that the contested
funds never made their way to the IRS until 2013, when his accounts
were properly credited: "The different branches of the Government
that controlled the funds and/or accounted for the funds, however,
did not arrange for payment of [sic] the IRS . . . until April
2013." (Id. at p. 8.)

No reasonable jury could find that the IRS was in possession
of and enjoyed the use of $4,431,051.33 since 2003. Williams'
attempt to avert the accrual of the interest charges could succeed
only if he had acted like the taxpayers in Goldring and overpaid
his tax deficiency to the IRS or if he had utilized 26 U.S.C. §
6603 (which allows taxpayers to make deposits with the IRS to
suspend the running of interest on potential underpayments). But

Williams did neither. Williams' use-of-money principle argument fails.

### (c)   Penalty without Statutory Authorization

Lastly, Williams contends that "[i]f the charging of interest is untethered to a 'use of funds' analysis, then interest simply becomes another form of penalty imposed on the Taxpayer without statutory authorization."   (Doc. #54, p. 14.) Williams asserts that "[t]his use of interest as a penalty when there is no statutory authorization for such use violates the Excessive Fines provision in the U.S. Constitution." (Id. at p. 15.)

The interest charges here are authorized by statute. "If any amount of tax imposed by this title . . . is not paid on or before the last date prescribed for payment, interest on such amount at the underpayment rate established under section 6621 shall be paid for the period from such last date to the date paid." 26 U.S.C. § 6601(a). Under the statute, the interest itself is treated as a tax. 26 U.S.C. § 6601(e)(1). And when it goes unpaid, interest keeps accruing. 26 U.S.C. § 6601(e)(2). Therefore, there is statutory authorization for the interest charged and Williams' argument fails.

Williams has not produced evidence that creates a genuine issue as to any material fact as to the correctness of the assess-

ments. The tax liability is valid and the presumption of correctness is intact. Summary judgment is warranted in favor of the United States as to Count I.

## B. Federal Tax Liens Against Property

In Counts II-IV, the United States seeks a declaratory judgment "that the tax liens that arise upon assessment of the taxes owed by Williams are valid and enforceable against all of the property and interest in property held by Williams, including the [Sanibel Property] . . . ." (Doc. #1, ¶ E.) The United States identifies three separate legal theories to justify the requested judgment: fraudulent transfer (Count II), nominee liability (Count III), and 26 U.S.C. § 6321 (Count IV). See (id. at ¶¶ 24-56.) The United States posits that 26 U.S.C. § 6321 suffices, and that "[a]lthough the Court need not determine the fraudulent transfer and nominee counts to determine that the tax liens attach to the Sanibel Property, the facts show that the liens also attach to the Sanibel Property under either theory." (Doc. #50, p. 19.) The Court will analyze the § 6321 position, and then evaluate the United States' remaining arguments.

### (1)  26 U.S.C. § 6321 Lien

"Where a 'person liable to pay any tax neglects or refuses to pay the same after demand, the amount [along with any applicable additions] . . . shall be a lien in favor of the United States upon all property and rights to property, whether real or personal,

belonging to such person.'" <u>United States v. Lena</u>, 370 F. App'x 65, 70 (11th Cir. 2010)(alteration in original)(quoting I.R.C § 6321). "Such a lien generally arises 'at the time the assessment is made' and continues 'until the liability for the amount so assessed (or a judgment against the taxpayer arising out of such liability) is satisfied or becomes unenforceable by reason of lapse of time.'" <u>Id</u>. (quoting I.R.C. § 6322). That lien is perfected against applicable third parties when notice is filed. <u>Console v. Comm'r</u>, 291 Fed. Appx. 234, 238 (11th Cir. 2008)(citing I.R.C. § 6323(a)).

The United States submits that the "[t]ax liens attached to all of Williams' property on September 7, 2011, the date the IRS assessed the liabilities against him." (Doc. #50, p. 19.) Williams denies he was assessed on September 7, 2011. (Doc. #50, Ex. 10, p. 25.) In his deposition Williams admitted he was assessed, but did not remember the date. Williams Dep. 34:12-35:4. The record reveals that Williams was indeed assessed on September 7, 2011 for a total of $6,169,486.95 on interest alone for the tax years 1996-1999. (Doc. #50, Ex. 8, pp. 11, 18, 24, 30.) Williams has yet to satisfy his assessed interest liability. Therefore, a lien arose against Williams on September 7, 2011, and remains in effect. <u>See</u> I.R.C. § 6322.

"The threshold question in this case, as in all cases where the Federal Government asserts its tax lien, is whether and to

what extent the taxpayer had 'property' or 'rights to property' to which the tax lien could attach." Aquilino v. United States, 363 U.S. 509, 512 (1960). To answer this question, the Supreme Court has instructed trial courts to "look initially to state law to determine what rights the taxpayer has in the property the government seeks to reach, then to federal law to determine whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property' within the compass of federal tax lien legislation." United States v. Craft, 535 U.S. 274, 278 (2003)(quoting Drye v. United States, 528 U.S. 49, 58 (1999)).

The specific property in question here is the Sanibel Property. The United States asserts that Williams transferred $287,938.70 for the purchase of the Sanibel Property, which accounts to "approximately 57 percent of the $500,000 purchase price . . . ." (Doc. #50, ¶ 35.) As a result, the United States seeks a declaratory judgment that Williams holds a fifty-seven percent (57%) interest in the Sanibel Property and that the federal tax lien attaches to that interest. (Id. at p. 25.)

Williams does not deny the transfers, summarized earlier on pages 4-5. (Doc. #50, Ex. 10, ¶¶ 30, 34, 40, 43, 49, 52.) The transfers originated from three different sources: (1) money from Williams' personal accounts, (2) money from a joint tax refund, and (3) money from a joint bank account. The Court looks to state

law to determine Williams' property rights as to each of these sources.

As an authorized user of his personal bank accounts, Florida law recognizes Williams' right to withdraw funds from the bank accounts. <u>Mallet v. Tunnicliffe</u>, 136 So. 346, 349 (Fla. 1931); <u>see also</u> Fla. Stat. § 674.403(1). Where a depositor can withdraw the full amounts from his bank accounts, those bank accounts constitute property or rights to property. <u>United States v. Nat'l Bank of Com.</u>, 472 U.S. 713, 724 (1985). Additionally, Florida law holds that "[a]ny deposit or account made in the name of two persons who are husband and wife shall be considered a tenancy by the entirety unless otherwise specified in writing." Fla. Stat. § 655.79. Florida also recognizes that once a joint tax refund check is issued, the check becomes tenancy by the entirety property regardless of which account it is subsequently deposited in. <u>Gibson v. Wells Fargo Bank, N.A.</u>, 255 So. 3d 944, 948-50 (Fla. 2d DCA 2018). The Supreme Court has held that a delinquent taxpayer's interest in a tenancy by the entirety constitutes "property" or "rights to property" under I.R.C. § 6321. <u>Craft</u>, 535 U.S. at 288.

The Court finds that the money from Williams' personal accounts, the joint tax refund, and the joint bank account all qualify as property under 26 U.S.C. § 6321. The federal tax lien attached to this property.

Once a lien attaches to property, it remains in place even if that property is transferred. United States v. Bess, 357 U.S. 51, 57(1958)("The transfer of property subsequent to the attachment of the lien does not affect the lien, for 'it is of the very nature and essence of a lien, that no matter into whose hands the property goes, it passes cum onere.'")(quoting Burton v. Smith, 38 U.S. 464, 477 (1839)). Thus, the United States' interest in this property remained intact when Williams transferred it in May 2016.

**(2)  Florida Uniform Fraudulent Transfer Act**

The Sanibel Property is exclusively titled to Smith-Williams, and a purchaser benefits from heightened protection under I.R.C. § 6323. Griswold v. United States, 59 F.3d 1571, 1575 (11th Cir. 1995)("[§ 6323] provides that, unless the government files a notice of federal tax lien with the designated recording office or the district court for the proper jurisdiction, the interests of any purchasers, holders of security interests, mechanic's lienors and judgment lien creditors prime that of the government."). A purchaser is "a person who, for adequate and full consideration in money or money's worth, acquires an interest (other than a lien or security interest) in property which is valid under local law against subsequent purchasers without actual notice." I.R.C. § 6323(h)(6). One such local law is the Florida Uniform Fraudulent Transfer Act (FUFTA).

The United States argues that "Williams' transfer of the funds used to purchase the Sanibel Property must be set aside because it was fraudulent as to the United States under the Florida Uniform Fraudulent Transfer Act." (Doc. #50, p. 20.) Williams makes two counterarguments: first, Williams contends that the transfers in question, the earliest being on May 10, 2016, are beyond Florida's (and Virginia's) statute of limitations and therefore the government's argument is barred. (Doc. #54, p. 17.) Second, Williams attempts to excuse the payments under the Pennsylvanian doctrine of necessaries. (Id., pp. 19-20.) The latter argument is addressed in a moment, while the former is without merit.[4]

---

[4] In United States v. Henco Holding Corp., 985 F.3d 1290, 1296-97 (11th Cir. 2021), the "[d]efendants argue[d] that the government [was] bound by Georgia's statute of limitations for claims brought under Georgia's fraudulent transfer statutes, which they assert[ed was] a four-year limitations period." Id. The Eleventh Circuit responded:

> This argument is without merit. "It is well settled that the United States is not bound by state statutes of limitation . . . in enforcing its rights." Indeed, "[w]hen the United States becomes entitled to a claim, acting in its governmental capacity and asserts its claim in that right, it cannot be deemed to have abdicated its governmental authority so as to become subject to a state statute putting a time limit upon enforcement."

Id.(alteration in original)(quoting United States v. Summerlin, 310 U.S. 414, 416-17 (1940)); see also United States v. Fernon, 640 F.2d 609, 612 (5th Cir. Mar. 1981); United States v. Moore, 968 F.2d 1099 (11th Cir. 1992).

"The FUFTA provides generally that a creditor may avoid a debtor's fraudulent transfer to the extent necessary to satisfy the creditor's claim." Isaiah v. JPMorgan Chase Bank, 960 F.3d 1296, 1302 (11th Cir. 2020)(citing Fla. Stat. § 726.108(1)(a)). Under FUFTA, a transfer is fraudulent "whether the creditor's claim arose before or after the transfer . . . if the debtor made the transfer . . . with actual intent to hinder, delay, or defraud any creditor of the debtor." Fla. Stat. § 726.105(1)(a). To determine whether a transfer was made with actual intent, courts look for the presence of "badges of fraud," such as:

(a)  The transfer or obligation was to an insider.

(b) The debtor retained possession or control of the property transferred after the transfer.

(c) The transfer or obligation was disclosed or concealed.

(d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(e) The transfer was of substantially all the debtor's assets.

(f) The debtor absconded.

(g) The debtor removed or concealed assets.

(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred.

(k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Id. § 726.105(2)(a)-(k). While "[a] single badge of fraud may only create a suspicious circumstance and may not constitute the requisite fraud to set aside a conveyance [] several of them when considered together may afford a basis to infer fraud." Wiand v. Lee, 753 F.3d 1194, 1200 (11th Cir. 2014)(alteration in original)(quoting Johnson v. Dowell, 592, So.2d 1194, 1197 (Fla. 2d DCA 1992)). Indeed, "[t]he existence of badges of fraud creates a prima facie case and raises a rebuttable presumption that the transaction is void." Id. (quoting Gen. Elec. Co. v. Chuly Int'l, LLC., 118 So.3d 325, 327 (Fla. 3d DCA 2013)).

The presence of multiple badges of fraud demonstrates Williams' actual intent to conduct fraudulent transfers. The transfers occurred between spouses, who are classified as insiders by the statute. Fla. Stat. § 726.102(8)(a)(1). Williams executed the transfers mere months after the IRS issued a notice of unpaid tax liabilities threatening a levy on Williams' bank accounts and seizure of his property. Williams exhibited control over the Sanibel Property by living at the property and paying at least the property's: (1) property taxes from 2016 through 2018, (2) homeowner's association fees, (3) maintenance such as lawncare, and (4) repair

work and home improvements like countertops and flooring. Additionally, Smith-Williams admits Williams resides at the Sanibel Property at least part of the year and that he made these payments. (Doc. #50, Ex. 11, ¶¶ 62, 65, 68, 71, 87-96.)

Williams counters that these payments were "necessary household expenses" under the Pennsylvanian doctrine of necessaries, citing In re Olexa, 317 B.R. 290, 292 (Bankr. W.D. Pa. 2004) and In re Arbogast, 466 B.R. 287, 294 (Bankr. W.D. Pa. 2012). (Doc. #54, pp. 19-20.) Both cases rely on Pennsylvania state statute 23 Pa. Stat. and Cons. Stat. § 4102 (West). Williams makes no effort to explain why a Pennsylvania statute would apply to Florida transactions. In any event, his own cited case refused to apply the doctrine of necessaries because it would "allow such judgment debtor to avoid too easily the reach of, that is to essentially abuse, fraudulent transfer laws." In re Arbogast, 466 B.R. at 310. Williams' necessary household expenses argument is without merit.

The badges of fraud established in this case demonstrate an actual intent to commit a fraudulent transfer which Williams has failed to effectively rebut. Accordingly, the transfers are void and the tax liens attach to Williams' interest in the Sanibel Property.

    **(3)   Nominee Theory**

"Alternatively," the United States argues, the "tax liens also attach to the Sanibel Property under the nominee theory."

28

(Doc. #50, p. 22.) The nominee theory and FUFTA substantially overlap. See United States v. Enright, 2015 WL 5883166, at *4 (M.D. Fla. Oct. 6, 2015) ("Florida's fraudulent transfer law has the same effect, for tax purposes, as the federal nominee theory, and courts applying the law look for some of the same factors.") The nominee theory holds that "[p]roperty of the nominee or alter ego of a taxpayer is subject to the collection of the taxpayer's tax liability." Shades Ridge Holding Co. v. United States, 888 F.2d 725, 728 (11th Cir. 1989) (citing G.M. Leasing Corp. v. United States, 429 U.S. 338, 350–51 (1977)). "[T]he nominee theory stems from equitable principles. Focusing on the relationship between the taxpayer and the property, the theory attempts to discern whether a taxpayer has engaged in a sort of legal fiction, for federal tax purposes, by placing legal title to property in the hands of another while, in actuality, retaining all or some of the benefits of being the true owner." United States v. Morgan, 2010 WL 148725, at *4 (M.D. Fla. Jan. 12, 2010), aff'd, 419 F. App'x 958 (11th Cir. 2011) (alteration in original)(quoting In re Richards, 231 B.R. 571, 578 (E.D.Pa.1999)). As summarized by another judge in this district:

> District courts in the Eleventh Circuit consider the following factors in determining whether property is being held by a nominee of the taxpayer: (1) whether the taxpayer exercised dominion and control over the property; (2) whether the property of the taxpayer was placed in the name of the nominee in anticipation of

> collection activity; (3) whether the purported nominee paid any consideration for the property, or whether the consideration paid was inadequate; (4) whether a close relationship exists between the taxpayer and the nominee; and (5) whether the taxpayer pays the expenses (mortgage, property taxes, insurance) directly, or is the source of the funds for payments of the expenses.

United States v. Wilkins, 2019 WL 12518510, at *18 (M.D. Fla. Feb. 26, 2019) (citing United States v. Dornbrock, 2008 WL 769065, at *5 (S.D. Fla. Jan. 17, 2008), aff'd, 309 F. App'x 359 (11th Cir. 2009)). "Not all of the foregoing factors are of equal weight, and they 'should not be applied rigidly or mechanically, as no one factor is determinative.'" Dornbrock, 2008 WL 769065, at *5 (quoting In re Richards, 231 B.R. at 579). The analysis ultimately turns on discerning who has "active" or "substantial" control of the property. Shades Ridge Holding Co., 888 F.2d at 728 (citing Valley Finance, Inc. v. United States, 629 F.2d 162, 172 (D.C.Cir.1980)).

Here, at least four of the five factors are present. As discussed under the FUFTA analysis, Williams has exercised control over the Sanibel Property by paying the property's homeowner's association fees, property taxes, upkeep, and home improvements. Williams executed the transfers mere months after the IRS issued a notice letter threatening collection. Finally, as spouses, Williams and Smith-Williams share a close relationship. The only factor remaining is whether adequate consideration was exchanged, an issue on which the parties disagree. See (Doc. #50, p. 24) ("But

the Williamses' alleged agreement is invalid because there was no consideration."); see also (Doc. #50, Ex. 13, p. 9)("[T]o the extent there were transfers between Williams and Smith Williams[sic], those transfers were loans or the repayment of loans which were premised on full consideration to both parties."). Drawing all reasonable inferences in favor of the non-moving party, the Court infers that valid consideration was exchanged. It is still evident, however, that Williams maintained substantial control of the Sanibel Property. Therefore, the federal tax liens attach to the Sanibel Property through the nominee theory as well.

Accordingly, it is now

**ORDERED:**

1. The United States' Motion for Summary Judgment (Doc. #50) is hereby **GRANTED**.

2. The United States of America is awarded a monetary judgment in the amount of $6,897,077.16 as of March 2, 2023, plus further interest and statutory additions as allowed by law, to the date of payment for the following unpaid tax liabilities, calculated as follows:

   (a) Unpaid federal taxes for tax year 1996, in the total amount of $3,711,475.67 in taxes, penalties, and interest, as of March 2, 2023, plus further interest and statutory additions thereafter, as provided by law, to the date of payment.

(b) Unpaid federal taxes for tax year 1997, in the total amount of $2,965,229.31 in taxes, penalties, and interest, as of March 2, 2023, plus further interest and statutory additions thereafter, as provided by law, to the date of payment.

(c) Unpaid federal taxes for tax year 1998, in the total amount of $121,222.80 in taxes, penalties, and interest, as of March 2, 2023, plus further interest and statutory additions thereafter, as provided by law, to the date of payment.

(d) Unpaid federal taxes for tax year 1999, in the total amount of $99,149.38 in taxes, penalties, and interest, as of March 2, 2023, plus further interest and statutory additions thereafter, as provided by law, to the date of payment

3. The Court declares that:

(a) The United States has VALID TAX LIENS for tax years 1996-1999, notice of which have been filed in the public records of Lee County, Florida.

(b) As to the Sanibel Property, a parcel of real property located at 1322 Sand Castle Road, Sanibel, Florida 33957, which is legally described as:

> Lot 20, Block B, THE DUNES AT SANIBEL ISLAND, a Subdivision, according to the map or plat thereof on file and recorded in the office of

the Clerk of the Circuit Court, recorded at
Plat Book 29, Pages 7 thru 12, Public Records
of Lee County, Florida. Parcel Identification
Number: 19-46-23-T4-0100B.0200,

Meredith Lee Smith-Williams is the nominee of Joseph
B. Williams III and Joseph B. Williams III holds at
least a fifty-seven percent (57%) interest in the
Sanibel Property.

(c)   The VALID TAX LIENS attach to Defendant Joseph B.
Williams III's property, including his fifty-seven
(57%) interest in the Sanibel Property.

4. The Clerk shall enter judgment accordingly and close the
file.

**DONE and ORDERED** at Fort Myers, Florida, this __16th__ day
of June, 2023.

_____
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:
Counsel of Record